UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

ADAM JAY BARR,

        Plaintiff,

v.

GUY'S FLOOR SERVICE, INC.,

        Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff, Adam Jay Barr, by and through his attorneys, HKM Employment Attorneys, LLP, for his Complaint against Guy's Floor Service, Inc. ("Defendant" or the "Company"), states and alleges as follows:

### PRELIMINARY STATEMENT

1. This is an employment discrimination case arising from Defendant's discrimination toward and wrongful termination of Plaintiff because he suffered from one or more disabilities within the meaning of the Americans with Disabilities Act ("ADA") requiring accommodation. Defendant penalized Plaintiff for exercising his right to take leave under the Family and Medical Leave Act ("FMLA"), and retaliated and/or discriminated against Plaintiff by terminating his employment within three months of his return from approved leave because of Plaintiff's disabilities and/or in retaliation for Plaintiff's protected activity of requesting reasonable accommodations related to his disabilities and/or exercising his rights under the FMLA.

## PARTIES

2. Plaintiff was a resident of Colorado at all times relevant to this Complaint.

3. Defendant Guy's Floor Service, Inc. is a Colorado corporation with a principal office located at 10275 E 47th Avenue, Denver, Colorado 80238.

4. Defendant is an employer within the meaning of 29 U.S.C. § 2611(4)(A), in that it has more than 50 employees within a 75-mile radius.

5. Defendant is an employer within the meaning of 42 U.S.C. § 12111(5)(A), in that it has 15 or more employees each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

## JURISDICTION AND VENUE

6. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

7. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

## PLAINTIFF IS EXHAUSTING HIS ADMINISTRATIVE REMEDIES

9. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

10. Plaintiff filed his Charge of Discrimination Numbers 32A-2019-00669 and FE2020128504 with the Equal Employment Opportunity Commission ("EEOC") and the Colorado Civil Rights Division ("CCRD"), respectively, for retaliation and disability

discrimination on or about July 22, 2019.

11. At the time of this filing, a Notice of Right to Sue has not been issued from the CCRD and/or EEOC regarding Plaintiff's above-referenced Charge Numbers for violations of Plaintiff's rights under the ADA. Plaintiff will amend this Complaint & Jury Demand upon receipt of a Notice of Right to Sue.

## FACTUAL ALLEGATIONS

12. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

13. Plaintiff began working for Defendant in approximately March 1993 and was most-recently employed as its Project Manager until his termination on April 18, 2019.

14. At all times during his employment with Defendant, Plaintiff met or exceeded Defendant's legitimate performance expectations.

15. On July 2, 2016, Plaintiff was in a motorcycle accident that resulted in several serious injuries, which included brachial plexus nerve damage that can be noticeable in Plaintiff's left hand when he turns pages of paper or performs certain manual tasks. Plaintiff's brachial plexus nerve damage substantially limits Plaintiff's ability to perform certain manual tasks as compared to the general population.

16. Following Plaintiff's motorcycle accident on July 2, 2016 requested and was approved to take leave under the FMLA between July 7, 2016 to on or about September 30, 2016 (Plaintiff's "2016 FMLA Leave"). Plaintiff was ultimately scheduled to and did return to work on October 3, 2016.

17. In an attempt to argue that Plaintiff's claims regarding his 2016 FMLA Leave are

time-barred, Defendant will contend that Plaintiff's 2016 FMLA Leave lasted only until August 9, 2016, after which time he was merely working from home pursuant to an accommodation request. However, Plaintiff never requested a mere five weeks of leave to recover from his serious, painful injuries.

18. In addition, correspondence between Mr. Barr and the Company through the month of September 2016 clearly referred to his continuing leave from work as FMLA leave. Also, the FMLA Certification filled out by Mr. Barr's doctor on or about September 6, 2016, stated that Plaintiff would be able to return to limited work on September 12, 2016 at the very earliest. Due to Plaintiff's extreme pain and inability to drive, Plaintiff's 2016 FMLA Leave was ultimately extended to on or about September 30, 2016.

19. During Plaintiff's 2016 FMLA Leave, Plaintiff was hospitalized for 15 days, after which he received medical treatment for his severe injuries and underwent ongoing physical therapy at home.

20. After approximately four to six weeks of being at home recovering from his severe injuries, Plaintiff 's supervisor, Brian Routzon, began pressuring Plaintiff to begin working from home during his protected 2016 FMLA Leave. In doing so, Defendant intentionally and willfully interfered with Plaintiff's right to leave under the FMLA. Feeling his job was in jeopardy, Plaintiff agreed to do paperwork and size homes for Defendant daily while continuing his recovery at home during his 2016 FMLA Leave.

21. Despite Plaintiff performing work from home for a significant portion of his 2016 FMLA Leave, Mr. Routzon continued to pressure Plaintiff to return to work at the office. For example, on August 30, 2016, Mr. Routzon told Plaintiff: "I would really like to set a time frame

[sic] for your return to the office as soon as possible. Doing the sizing and such has been helpful, but we are really in need of your presence in the office."

22. When Plaintiff returned to work on October 3, 2016, Plaintiff immediately noticed a change in Mr. Routzon's demeanor toward him. For example, Plaintiff was subjected to negative comments and hostile harassment from Mr. Routzon targeting his nerve damage and punishing Plaintiff for his 2016 FMLA Leave.

23. For instance, if Plaintiff had difficulty turning a large blueprint page with his left hand, Mr. Routzon would yell at Plaintiff to, "turn the f*cking page already!"

24. Mr. Routzon also referred to Plaintiff as "lefty" on multiple occasions.

25. Mr. Routzon also often acted frustrated and angry at Plaintiff over innocuous issues and held Plaintiff to higher performance expectations. He also stopped including Plaintiff in meetings and discussions as often as Plaintiff had been included prior to his motorcycle accident and 2016 FMLA Leave.

26. Defendant continued to pay Plaintiff his salary during his 2016 FMLA Leave. Although Plaintiff worked from home for Defendant during approximately the last six weeks of his 2016 FMLA Leave, upon Plaintiff's return to work, Mr. Routzon decided that Plaintiff's earned annual bonus would be reduced to reimburse Defendant for the compensation Plaintiff had received during the entirety of his 2016 FMLA Leave. Plaintiff was therefore denied earned wages for work he was pressured to perform during his 2016 FMLA Leave and/or subjected to a reduction of approximately $8,000 from his earned annual bonus as a punishment for his 2016 FMLA Leave.

27. Mr. Routzon's changed, hostile treatment toward Plaintiff following his 2016 FMLA Leave gradually improved in some respects, though it was necessary for Plaintiff to

routinely work on nights and weekends to meet Mr. Routzon's heightened performance expectations.

28. In or around the beginning of October 2018, Plaintiff requested the reasonable accommodation of time off work for knee surgery to repair his torn meniscus. Plaintiff specifically requested and was approved to take time off work for his surgery on November 15, 2018. Plaintiff agreed to work from home after his surgery until his return to the office on November 26, 2018.

29. Plaintiff underwent knee surgery on November 15, 2018. On or before November 25, 2018, Plaintiff developed a staph infection and was hospitalized for a week, followed by six weeks of receiving intravenous medication at home.

30. During the ten days between Plaintiff's surgery and his life-threatening staph infection, Plaintiff performed work for Defendant at home and completed the sizing for approximately 10 to 12 homes. When Plaintiff developed a staph infection on or before the day he was scheduled to return to the office, Plaintiff's wife notified Defendant's office manager, Kathy Davis, about Plaintiff's hospitalization, infection, and need for surgery on the evening of November 26, 2018.

31. Soon after Plaintiff's wife notified Defendant's office manager about Plaintiff's need for leave for a serious health condition, Mr. Routzon called Plaintiff. Mr. Routzon was noticeably angry and yelled, "How the f*ck did you get a staph infection!?" He then incorrectly said, "Well we are not going to pay you this time, we paid you for eight months the last time when you had your motorcycle accident!"

32. This statement was incorrect, given that Plaintiff had not missed more than three months of work during his 2016 FMLA Leave, and Defendant had taken the compensation it paid

Plaintiff during his 2016 FMLA Leave from Plaintiff's earned bonus – even though Plaintiff performed work for Defendant during a significant portion of his 2016 FMLA Leave.

33. Plaintiff took FMLA leave for his staph infection from November 25, 2018 to January 22, 2019 (Plaintiff's "2018-2019 FMLA Leave").

34. During his 2018-2019 FMLA Leave, Plaintiff had to exchange 13 calls with Mr. Routzon for various work-related matters. Plaintiff believed that Defendant had arranged some coverage for his responsibilities while he was out on his 2018-2019 FMLA Leave. Upon information and belief, Defendant did not provide coverage for a significant portion of Plaintiff's job responsibilities during his 2018-2019 FMLA Leave.

35. On January 22, 2019, Plaintiff's first day back at work from leave, Plaintiff learned that Mr. Routzon and his assistant had gone through Plaintiff's office belongings and paperwork during his 2018-2019 FMLA Leave. As soon as Plaintiff met with Mr. Routzon that day, Mr. Routzon questioned whether Plaintiff was "of sound mind," which Plaintiff understood to be a reference to Mr. Routzon's prejudiced view of Plaintiff's health. Plaintiff was uncomfortable and confirmed that he was "of sound mind."

36. Mr. Routzon then told Plaintiff that, during his 2018-2019 FMLA Leave, Mr. Routzon had purportedly found some sizing mistakes he believed Plaintiff had made.

37. Sizing mistakes are not unusual in the ordinary course of Defendant's operations and Mr. Routzon in no way informed Plaintiff that the purported "sizing mistakes" put Plaintiff's employment in jeopardy.

38. Mr. Routzon also told Plaintiff that Defendant, through no fault of Plaintiff's, was having a problem with some defective wood flooring that had been sold to several builders. Mr.

Routzon told Plaintiff that he was going to be responsible for coordinating the replacements for 11 occupied homes with defective wood flooring, along with one occupied home for a full floor vinyl replacement, due to poor insultation. In addition to the defective wood and vinyl floor replacements, Mr. Routzon also made Plaintiff responsible for coordinating a hardwood basement floor replacement due to water damage (the "Classic Homes Replacement"), which required a week to complete. In addition to the foregoing, Mr. Routzon also made Plaintiff responsible for coordinating 40 units of carpet repairs of Mr. Routzon's account at the Lodge at Flying Horse (the "Lodge at Flying Horse Carpet Repairs"), which also required a week to complete.

39. In doing so, Mr. Routzon subjected Plaintiff to a significant increase and/or change in responsibilities following his return from his 2018-2019 FMLA Leave, and Defendant further effectively denied Plaintiff reinstatement to the same or an equivalent position following his 2018-2019 FMLA Leave.

40. Between January 22, 2019 until his termination on April 18, 2019, Plaintiff was expected to and did perform the sizing measurements and full replacements for a total of 12 occupied homes, along with the Classic Homes Replacement, and the Lodge at Flying Horse Carpet Repairs, while also being expected to handle the job responsibilities Plaintiff performed before his 2018-2019 FMLA Leave. Plaintiff finished the last of the defective wood floor replacements, the vinyl floor replacement, and the repairs on the additional properties, on top of his normal responsibilities, on the day that Mr. Routzon suddenly terminated Plaintiff – April 18, 2019.

41. Upon Plaintiff's return from his 2018-2019 FMLA Leave, Plaintiff also learned that there had been minimal coverage for Plaintiff's responsibilities during his 2018-2019 FMLA

Leave, and he was expected to catch up his accounts, while performing the time-consuming defective wood floor replacements, the vinyl floor replacement, the Classic Homes Replacement, and the Lodge at Flying Horse Carpet Repairs, in addition to his normal duties in the office. Although Defendant had three other Project Managers in addition to Plaintiff, none of the other Project Managers were asked to share any of the additional work load that Mr. Routzon required Plaintiff to perform while handling his normal job responsibilities in the office.

42. When Plaintiff returned from work following his 2018-2019 FMLA Leave on January 22, 2019 and until his termination on April 18, 2019, Mr. Routzon's demeanor toward Plaintiff also became noticeably distant and cold. For example, Mr. Routzon was very short with Plaintiff, and sometimes would not even respond to Plaintiff's work-related questions. Mr. Routzon also ridiculed Plaintiff in front of others, was negative when he made suggestions, and stopped giving Plaintiff credit for his accomplishments.

43. Mr. Routzon also at times engaged in hyper-surveillance and nit-picked Plaintiff's work. For example, on or about April 2, 2019, Mr. Routzon called Plaintiff and asked where Plaintiff went every day, insinuating that Plaintiff had been absent from work. Plaintiff reminded Mr. Routzon that he had put Plaintiff in charge of all the replacements associated with the defective wood flooring, on top of his regular office work, and that he was being consumed in the field as a result. Mr. Routzon replied, "Okay, I guess maybe I did."

44. After returning to work following Plaintiff's 2018-2019 FMLA Leave, Plaintiff was also excluded from meetings on Plaintiff's accounts that he had previously regularly attended – including meetings with the account requiring the defective wood floor replacements.

45. Mr. Routzon also subjected Plaintiff to disparate treatment in terms of his

attendance. For example, on or about April 10, 2019, approximately a week before Plaintiff's sudden termination, there was a severe storm referred to as a "bomb cyclone" in the local news. As Mr. Routzon was aware, Plaintiff had to drive from Littleton, Colorado to Colorado Springs, Colorado and arrive at the office by 6:00 a.m. each morning. Early the morning of April 10, 2019, Mr. Routzon called a Field Manager of Defendant's, Hank Dowd, that lives in Golden, Colorado to tell him not to drive to the office in Colorado Springs due to the weather. Mr. Routzon did not call Plaintiff to inform him that he did not need to drive to Colorado Springs in unsafe weather conditions. Instead, when Plaintiff eventually spoke with Mr. Routzon around 8:00 a.m. that day, Mr. Routzon begrudgingly told Plaintiff that he could head back home if he wanted.

46. On the day of Plaintiff's termination, April 18, 2019, Plaintiff was called into Mr. Routzon's office. Mr. Routzon closed the door and asked Plaintiff how he was doing and how his job was going. Plaintiff told Mr. Routzon that he had been feeling overwhelmed keeping up with his field duties and his paperwork duties in the office while handling the increased workload from the defective wood floor replacements. Even though Plaintiff had finished the last house that needed a floor replacement that very same day, and after working for Defendant for 26 years, Mr. Routzon suddenly told Plaintiff, "This isn't working. If you can't keep up and do the replacements at the same time, you're no longer needed."

47. Plaintiff reminded Mr. Routzon that he had finished the last defective wood floor replacement that day, and that he would be able to be in the office more starting the very next day. Mr. Routzon was dismissive and told Plaintiff he was "done and through" working for Defendant because he was "not able to keep up." Plaintiff was shocked and asked if Mr. Routzon was firing him. Mr. Routzon yelled, "You're done and relieved of your job!"

48. On the day of Plaintiff's termination, Mr. Routzon also insisted that Plaintiff should have used another employee of Defendant's, Duane Mykra, to help him with his significantly increased workload if he was "not able to keep up."

49. Mr. Mykra was formerly a Field Manager that Mr. Routzon had transferred and/or demoted to an Estimator position after Mr. Routzon believed that Mr. Mykra was struggling with his job responsibilities as a Field Manager.

50. In or around January 2018, Mr. Routzon overheard Plaintiff helping Mr. Mykra with a question he had asked Plaintiff. Mr. Routzon then told Plaintiff in an intimidating manner to stay out of Mr. Mykra's business and not to ask him to do any work.

51. Defendant's shifting and inconsistent explanations regarding whether Plaintiff could have used Mr. Mykra to assist him with his increased workload are indicative of pretext.

**FIRST CLAIM FOR RELIEF**
**(Disability Discrimination in Violation of the Americans with Disabilities Act, as amended ("ADA"))**

52. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

53. Plaintiff is a disabled person within the meaning of the ADA.

54. Plaintiff suffers from brachial plexus nerve damage in his left hand, in addition to suffering from a life-threatening staph infection following his knee surgery on November 15, 2018.

55. Plaintiff suffered from one or more disabling medical conditions at the time of his termination that were known to Defendant.

56. Plaintiff was qualified for his job and capable of performing the essential functions of his position with or without a reasonable accommodation at the time he was terminated.

57. Plaintiff was regarded as being disabled by Defendant.

58. On or about April 18, 2019, Defendant discriminated against Plaintiff because of his actual and/or perceived disabilities by terminating his employment because of his actual and/or perceived disabilities, in violation of the ADA. In addition, one or more of Plaintiff's coworkers who were not of Plaintiff's protected class were treated more favorably in the terms and conditions of their employment as compared to Plaintiff.

59. The effect of the practices complained of in the paragraphs above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of Plaintiff's actual and/or perceived disabilities.

60. Defendant's above-described conduct was intentional.

61. Defendant's above-described conduct was done with malice or reckless indifference to Plaintiff's federally-protected rights.

62. As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

## SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of the ADA, as amended)

63. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

64. Since at least November 25, 2018, if not earlier, Plaintiff made requests for reasonable accommodations related to his actual and/or perceived disabilities. For instance,

Plaintiff requested the reasonable accommodation of leave from work for less than two months due to a life-threatening staph infection following his knee surgery. In doing so, Plaintiff was engaging in activity protected under the ADA.

65. Plaintiff's used the reasonable accommodation of leave from work for an actual and/or perceived disability from approximately November 25, 2018 until his return to work on or about January 22, 2019. In doing so, Plaintiff was engaging in activity protected under the ADA.

66. Plaintiff was retaliated against by Defendant after he engaged in the above-described protected activity.

67. For example, on or about January 22, 2019, Plaintiff was subjected to disparate terms and conditions of employment, including heightened performance requirements, hyper-surveillance, cold and hostile treatment, exclusion from meetings Plaintiff had previously regularly attended, a significant increase in responsibilities, and, ultimately, Defendant's termination of Plaintiff's employment.

68. Defendant engaged in the above-described conduct and terminated Plaintiff's employment because of Plaintiff's actual and/or perceived disabilities, and/or in retaliation for Plaintiff engaging in the protected activity of requesting and using a reasonable accommodation related to his actual and/or perceived disabilities. These consequences are of the type that would tend to discourage similarly situated employees from requesting or using accommodations and/or from engaging in protected activity under the ADA.

69. Defendant engaged in unlawful employment practices in violation of Section 503(a) of the ADA, 42 U.S.C. § 12203(a) by discharging Plaintiff for engaging in the above-described protected activity.

70. A causal connection exists between Plaintiff's protected activities and Defendant's materially adverse actions, i.e., Defendant terminated Plaintiff because he requested and/or required reasonable accommodation related to his actual and/or perceived disabilities.

71. Defendant's above-described conduct was intentional.

72. Defendant's above-described conduct was done with malice or with reckless indifference to Plaintiff's federally-protected rights.

73. As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages and attorneys' fees and costs as permitted by law.

### THIRD CLAIM FOR RELIEF
**(Interference with Rights under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601, *et seq.*)**

74. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

75. The FMLA's purpose is to address the problem of "inadequate job security for employees who have serious life conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(b)(1).

76. Defendant operates in interstate commerce and, upon information and belief, has over 50 employees within a 75-mile radius of the location where Plaintiff was employed. Defendant is therefore a "covered employer," as defined at 29 U.S.C. § 2611(4) under the Family and Medical Leave Act, 29 U.S.C. §§ 2611, *et seq.*

77. As a "covered employer," under the FMLA, Defendant is required to offer any

"eligible employee," as defined at 29 U.S.C. § 2611(2), up to 12 weeks of leave from work "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

78. Plaintiff was an "eligible employee" entitled to the protections of the FMLA when his need for leave arose on or about July 2, 2016.

79. On or about July 2, 2016, Plaintiff was qualified to obtain leave under the FMLA in that he had a serious health condition.

80. By pressuring Plaintiff to return to work and asking Plaintiff to work from home for approximately six weeks during his 2016 FMLA Leave, Defendant violated 29 U.S.C. § 2615(a)(1) by unlawfully interfering with, denying or restraining Plaintiff's right to protected, voluntary medical leave under the FMLA.

81. Defendant's violation of the FMLA was willful and without justification. Therefore, the FMLA's three-year statute of limitations period for a "willful" violation of the FMLA is applicable to this claim. *See* 29 U.S.C. § 2617(c).

82. Defendant's above-described conduct and violations of the FMLA were done with malice and oppression and with a conscious disregard for Plaintiff's rights under the FMLA.

83. Plaintiff is entitled to damages equal to his lost wages, salary, employment benefits and other compensation denied or lost, liquidated damages as provided under the FMLA, costs, attorneys' fees, interest, and equitable relief as deemed appropriate.

**FOURTH CLAIM FOR RELIEF**
**(Retaliation under the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601, *et seq.*)**

84. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

85. Defendant discriminated and retaliated against Plaintiff because he exercised rights that should have been protected under the FMLA with respect to his 2016 FMLA Leave and his 2018-2019 FMLA Leave.

86. More specifically, following Plaintiff's 2016 FMLA Leave, Defendant retaliated against Plaintiff for exercising his rights to leave under the FMLA by failing to pay Plaintiff for the work he was asked to perform for Defendant during approximately six weeks of his leave and/or reducing Plaintiff's earned annual bonus due to Plaintiff's use of FMLA leave; excluding Plaintiff from meetings and discussions he had routinely participated in prior to his 2016 FMLA Leave; and subjecting Plaintiff to harassment and disparate terms, conditions and privileges of employment, including heightened performance standards that required Plaintiff to work nights and weekends following his 2016 FMLA Leave.

87. Defendant's above-described acts and omissions violated 29 U.S.C. § 2615(a)(2) by unlawfully retaliating against Plaintiff upon his return to work on or about October 3, 2016 for exercising his right to medical leave under the FMLA.

88. Following Plaintiff's 2018-2019 FMLA Leave, Defendant retaliated against Plaintiff for exercising his rights to leave under the FMLA by subjecting Plaintiff disparate terms, conditions and privileges of employment, including heightened performance standards, hyper-surveillance, non-uniform rules regarding attendance; subjecting Plaintiff to a significant increase in responsibilities and/or failing to reinstate Plaintiff to the same or equivalent position; and ultimately terminating Plaintiff's employment.

89. Defendant's above-described acts and omissions violated 29 U.S.C. § 2615(a)(2) by unlawfully retaliating against Plaintiff upon his return to work on or about January 22, 2019 for

exercising his right to medical leave under the FMLA.

90. Defendant's violations of the FMLA were willful and without justification. Therefore, the FMLA's three-year statute of limitations period for a "willful" violation of the FMLA is applicable to these claims. *See* 29 U.S.C. § 2617(c).

91. Defendant's above-described conduct and violations of the FMLA were done with malice and oppression and with a conscious disregard for Plaintiff's rights under the FMLA.

92. Plaintiff is entitled to damages equal to his lost wages, salary, employment benefits and other compensation denied or lost, liquidated damages as provided under the FMLA, costs, attorneys' fees, interest, and equitable relief as deemed appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor against Defendant and order the following relief as allowed by law:

A. Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, garden-variety emotional distress, pain, inconvenience, mental anguish, and loss of enjoyment of life;

B. All legal and equitable relief available under the FMLA;

D. Punitive damages for all claims as allowed by law;

E. Attorneys' fees and costs of this action;

F. Pre-judgment and post-judgment interest at the highest lawful rate; and

G. Such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 16th day of August, 2019.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: *s/ Shelby Woods*
  Claire E. Hunter
  Shelby Woods
  HKM Employment Attorneys LLP
  730 17th Street, Suite 750
  Denver, Colorado 80202
  chunter@hkm.com
  swoods@hkm.com
  *Attorneys for Plaintiff Adam Jay Barr*